PACIFICORP, et al., Petitioners,

v.

**FEDERAL ENERGY REGULATORY COMMISSION, et al., Respondents,**

**and**

**Atlantic Richfield Co., et al., Intervenors.**

**Nos. 84–7569, 84–7862 and 85–7103.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 10, 1985.

Decided July 28, 1986.

Marcus Wood and Peter R. Jarvis, Stoel, Rives, Boley, Fraser & Wyse, Portland, Or., for petitioners.

Harvard P. Spigal, Gen. Counsel, John A. Cameron, Jr., Asst. Gen. Counsel, David J. Adler, Portland, Or., and Randy A. Roach, Seattle, Wash., Bonneville Power Administration, and Charles H. Turner, U.S. Atty., Jack G. Collins and Thomas C. Lee, Asst. U.S. Attys., Portland, Or., for respondents.

Paul M. Murphy, Heller, Ehrman, White & McAuliffe, Portland, Or., for intervenors.

Before WALLACE, HUG and SCHROEDER, Circuit Judges.

SCHROEDER, Circuit Judge.

## I. INTRODUCTION

These consolidated petitions require us once again to construe provisions of the Pacific Northwest Electric Power Planning and Conservation Act (Regional Act), 16 U.S.C. § 839-839h (1981), which we have termed "a unique piece of energy legislation." *Central Lincoln Peoples' Utility District v. Johnson*, 735 F.2d 1101, 1106 (9th Cir.1984). The general background and history of the Act are explained in *Aluminum Co. of America v. Central Lincoln Peoples' Utility District*, 467 U.S. 380, 104 S.Ct. 2472, 2476–79, 81 L.Ed.2d 301 (1984), and do not bear further repetition here.

The statutory provision at issue in this case is section 5(c), 16 U.S.C. § 839c(c) (1981). This section establishes a power exchange program between the Bonneville Power Administration (BPA) and investor-owned utilities (IOUs) in the Pacific Northwest. The program enables IOUs to furnish residential power at lower rates than their costs would permit. The IOUs otherwise would have to sell power to their residential customers at rates much higher than rates paid by residential customers of publicly owned utilities, who receive lower-cost federal power.

Under the exchange system contemplated by section 5, each electric utility in the Northwest may elect to sell power to BPA at the "average system cost [ASC] of [a] utility's resources." 16 U.S.C. § 839c(c)(1); *see also* 16 U.S.C. § 839a(19) (defining "resource"). BPA then sells the same amount of power back to the utility at BPA's lower wholesale rate. This enables the utility to sell power to its residential customers at the priority rate given to residential consumers receiving BPA federal power. In reality the exchange is a paper transaction. It is designed to eliminate the disparity that developed between the rates paid by residential customers of the IOUs and the lower rates paid by residential customers of publicly owned utilities. This disparity began after projections showed that electric demand would exceed supply in the 1970s. Accordingly, BPA informed the IOUs in 1973 that it would not renew its contracts with them because it could not continue to meet their requirements. To meet the increased demand, the IOUs constructed more expensive generating resources, ultimately resulting in rate disparity between IOU and federal residential ratepayers. *See* H.R.Rep. No. 976 (Part I), 96th Cong., 2d Sess. 24–29, *reprinted in* 1980 U.S.Code Cong. & Ad. News 5989, 5990. *See also Aluminum Co. of America v. Central Lincoln Peoples' Utility District*, 467 U.S. 380, 104 S.Ct. 2472, 2477, 81 L.Ed.2d 301 (1984); *see generally* Blumm, *The Northwest's Hydroelectric Heritage: Prologue to the Pacific Northwest Electric Power Planning and Conservation Act*, 58 Wash.L.Rev. 175, 221–30 (1983).

Section 5(c)(1) of the Regional Act creates the residential exchange program. It states:

Whenever a Pacific Northwest electric utility offers to sell electric power to the Administrator at the average system cost of that utility's resources in each year, the Administrator shall acquire by purchase such power and shall offer, in exchange, to sell an equivalent amount of electric power to such utility for resale to that utility's residential users within the region. 16 U.S.C. § 839c(c)(1).

Section 5(c)(7) of the Act requires BPA to develop a "methodology" for determining each utility's average system cost in proceedings akin to rate making proceedings.

The "average system cost" for electric power sold to the Administrator under this subsection shall be determined by the Administrator on the basis of a methodology developed for this purpose in consultation with the Council, the Administrator's customers and appropriate State regulatory bodies in the region. Such methodology shall be subject to review and approval by the Federal Energy Regulatory Commission.... 16 U.S.C. § 839c(c)(7).

This case concerns BPA's revision of the initial methodology which it had adopted in 1981. FERC granted interim approval of the 1981 methodology on October 1, 1981, and the methodology was put into effect on that date. FERC ultimately granted final approval to the initial methodology on October 6, 1983, retroactive to October 1, 1981. FERC Order No. 337, 48 Fed.Reg. 46,970 (1983). On October 7, 1983, the BPA initiated consultation proceedings to revise the original methodology, and on October 1, 1984, FERC approved the revised methodology. Order No. 400, "Final Rule," 49 Fed.Reg. 39,293 (1984). FERC clarified the final order and denied a petition for rehearing on February 1, 1985. Order No. 400–A, 50 Fed.Reg. 4,970 (1985).

The revised methodology had the effect of reducing the average system cost in two material ways. First, it eliminated income taxes from average system cost calculations, and second, it eliminated return on equity as a cost factor and substituted for it the embedded cost of long-term debt.

The result is a substantial reduction in the amount of money which BPA pays to the IOUs under the exchange program.

The petitioners in this case challenge the revised methodology. Petitioners are eight IOUs and four state regulatory agencies of the region. The respondents are BPA and FERC.

In addition, certain direct service industrial customers (DSIs) and the Public Power Council have intervened on behalf of the respondents. The payments which BPA makes to the IOUs under the Regional Act's exchange program must be recovered through the rates that BPA charges to other customers. The DSIs, principally large aluminum companies buying power directly from BPA, are to make up most of that difference. Thus the reduction in Regional Act payments to the IOUs caused by the revised methodology is reflected in reduction in rates paid by the DSIs. The Public Power Council represents consumer-owned utilities in the region whose rates are also affected by the ASC exchange program.

Although section 5 of the Regional Act provides for the development of a method of calculating the "average system cost" of each utility's resources, the Act does not explain the term. Section 5(c)(7) provides that the methodology for calculating the ASC shall not include three categories of costs: the costs of resources needed to serve new large single loads, the costs of resources used to serve new loads outside the region, and terminated plant costs. 16 U.S.C. § 839c(c)(7). Other than these express exclusions, "average system cost" is not defined anywhere in the Act. Controlling issues in this case therefore turn on interpreting section 5, and, more specifically, on the extent of BPA's discretion in developing an average system cost methodology.

In addition to their challenge to the substance of the revised methodology, petitioners object to its timing. They argue that BPA's institution of proceedings to revise the methodology was premature and in violation of a contractual commitment con-

tained in their Residential Agreements with BPA. They ask that we invalidate the methodology on that ground as well.

## II. JURISDICTION

Petitioners have filed three petitions because of uncertainty over application of the 90–day limitation period prescribed in the jurisdictional provision of the Regional Act. That statute provides:

> Suits to challenge the constitutionality of this chapter, or any action thereunder, final actions and decisions taken pursuant to this chapter by the Administrator ... or the implementation of such final actions ... shall be filed in the United States Court of Appeals for the region. Such suits shall be filed within 90 days of the time such action or decision is deemed final....

Regional Act § 9(e)(5), 16 U.S.C. § 839f(e)(5).

Petitioners filed their first petition in this court, No. 84–7569, on August 31, 1984, after BPA first adopted its rules revising the ASC. They filed the second, No. 84–7862, on December 26, 1984, after FERC entered its order approving the methodology in what was termed a "final rule." The third, No. 85–7103, filed on February 25, 1985, sought review after FERC's subsequent order denying petitioners' petition for rehearing and clarifying its earlier final rule.

■ This court has held, and the parties do not dispute, that under the jurisdictional provisions of Regional Act section 9(e)(5), we have jurisdiction to review only final actions in BPA rate proceedings. "[S]ection 839f(e)(4)(D) precludes us from treating rate determinations as final actions before FERC has confirmed and approved the rates." *Central Lincoln Peoples' Utility District v. Johnson,* 735 F.2d at 1109. In this proceeding, which is akin to a rate proceeding, the methodology did not become final until FERC denied the petitioners' petition for rehearing. Therefore, our jurisdiction has properly been invoked in petition number 85–7103, and the remaining petitions are dismissed. *California*

*Energy Commission v. Johnson,* 767 F.2d 631, 635 (9th Cir.1985).

## III. THE SCOPE OF OUR REVIEW OF BPA'S INTERPRETATION OF THE ACT

■ At the heart of the struggle between the adversaries in this case is a disagreement as to how much discretion Congress intended to give BPA in determining ASC methodology. Petitioners, in arguing that the average system cost should include taxes and return on equity, argue that BPA has misinterpreted a congressional mandate for an inclusive methodology. BPA, supported by FERC and the intervenors, has taken the position that the statute allows more flexibility.

In reviewing the BPA determination, FERC paid great deference to the interpretation that BPA gave to the statute, stating that so long as the methodology "is based on a reasonable interpretation of the [Regional Act], the Commission should approve it, even if it is not the interpretation that the Commission itself would have adopted." FERC Final Rule Order, No. 400, 49 Fed.Reg. 39,293 (1984), Part III A. Such deference is required not only by the general principle of deference to an agency's interpretation of statutes which are entrusted to its administration, *Blum v. Bacon,* 457 U.S. 132, 141–42, 102 S.Ct. 2355, 2361–62, 72 L.Ed.2d 728 (1982), but also by the pointed language of the Supreme Court in *Aluminum Co. of America v. Central Lincoln Peoples' Utility District,* 467 U.S. 380, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984), with regard to BPA's interpretation of the Regional Act. The Court noted that because of BPA's expertise, BPA's involvement in the drafting of the statute, and the technical complexities of the subject, "it is clear that the Administrator's interpretation of the Regional Act is to be given great weight." *Id.,* 104 S.Ct. at 2479–80. This court has also recognized the special deference due the Bonneville Power Administration with respect to the interpretation of this Act. *See, e.g., Department of Water and Power v. Bonne-*

*ville Power Administration,* 759 F.2d 684, 690–91 (9th Cir.1985); *Central Lincoln Peoples' Utility District v. Johnson,* 735 F.2d 1101, 1116 (9th Cir.1984).

Petitioners do not dispute the degree of deference ordinarily given to BPA's interpretations of this statute. They maintain, however, that this is an extraordinary agency interpretation rather than an ordinary one. Petitioners point to the fact that BPA has changed the methodology that it previously adopted. Petitioners argue that this change constitutes an interpretation of the statute contrary to prior interpretation, and that therefore no deference is due BPA's current interpretation of the statute.

Petitioners rely upon a well recognized line of authority which establishes the principle that courts need not defer to agency action that is contrary to a long-standing prior position. *Motor Vehicles Manufacturers Association v. State Farm Mutual Auto Insurance Co.,* 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *United States v. Leslie Salt Co.,* 350 U.S. 383, 76 S.Ct. 416, 100 L.Ed. 441 (1956). The Supreme Court stated the principle in *United States v. Leslie Salt Co.,* involving a Treasury Department about face: "[A]gainst the Treasury's prior long-standing and consistent administrative interpretation its more recent *ad hoc* contention as to how the statute should be construed cannot stand." 350 U.S. at 396, 76 S.Ct. at 424. There are, however, at least two defects in the petitioners' conclusion that this principle applies here.

First, assuming that the agency has changed its interpretation of the statute, it has not reversed any longstanding interpretation. BPA implemented the first methodology in 1981, and based upon its experience, it adopted the second in 1983 after extended rule making proceedings. The Supreme Court has recognized that agencies need some flexibility to change regulations based upon increased experience and information. *See Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 2792, 81 L.Ed.2d 694 (1984).

More important, petitioners have not shown that BPA, by changing the methodology, changed its interpretation of the statute. BPA explained that the 1983 changes in methodology were based on its experience with the earlier methodology. It chose a different set of alternatives than it chose before. The BPA Administrator's statements, both in 1981 when the original methodology was adopted and in 1983 when this revised methodology was adopted, reflect his continuing interpretation that the statute gave BPA some discretion to select costs which should be excluded.

For example, the Administrator's Record of Decision in August 1981 states that the Administrator, at that time, agreed with the IOUs that return on equity should be allowed as a cost. It is significant that he did not state that the statute required inclusion of equity returns. He agreed because in his 1981 view, a policy of disallowance would have unwisely encouraged utilities to rely more on debt rather than on equity financing. The implicit premise was that the statute was flexible enough to provide alternatives; choosing among them was a question of policy, not of statutory interpretation.

BPA's evaluation of policy considerations may have changed, but its interpretation of the statute has not. Neither in 1981 nor in 1983 did BPA adopt a position that the statute mandated inclusion of taxes and return on equity as part of average system cost.

We therefore conclude that BPA's adoption of the revised ASC is not a reversal of long standing statutory interpretation and that BPA's interpretation is entitled to great deference and must be upheld unless it is unreasonable.

## IV. EXCLUSION OF TAXES AND EQUITY RETURN

■ We must consider petitioners' arguments that BPA has violated the statute by excluding taxes and equity return from ASC, but we must consider those argu-

ments on a standard highly deferential to BPA. *Aluminum Co. of America v. Central Lincoln Peoples' Utility District,* 467 U.S. 380, 104 S.Ct. 2472, 2479–80, 81 L.Ed.2d 301 (1984). Judged by that standard, petitioners' arguments are not persuasive.

They rely heavily upon a statement by one of the Act's principal sponsors, Senator McClure, during floor debate on the Act. Senator McClure stated that "subject to the exclusions in section 5(c)(7), the average system cost methodology worked out by the Bonneville Power Administration should pay the *full cost* of power exchanged to the BPA...." 126 Cong.Rec. S–14, 698 (1980) (emphasis added). Petitioners contend that "full cost" includes equity returns and income tax costs.

The difficulty is that Senator McClure did not elaborate on what he meant by "full cost" and the Act does not define it. Rather, it is assigned to the BPA Administrator in rate making proceedings to devise a "methodology" for determining costs. Regional Act, section 5(c)(7), 16 U.S.C. § 839c(c)(7). The provisions for consultation with all interested parties and review by FERC strongly suggest that Congress was aware that difficult judgments needed to be made. The statutory scheme militates against petitioners' theory that Congress intended all costs to be included except those specifically excluded in section 5(c)(7).

Indeed, the Senate Report on the bill that became the Regional Act is contrary to petitioners' position. It noted that the bill itself contained certain exclusions, but stated that they were not intended to be exclusive. According to the Senate Report, section 5(c)(7) "contains a list of costs to be excluded in the determination of average system costs; additional exclusions may be incorporated in the methodology for determining average system costs under this section." S.Rep. No. 272, 96th Cong., 1st Sess. 27 (1979). Therefore neither the language of the statute nor the legislative history supports a holding that discretion to exclude costs is narrowly confined.

We turn to the two specific substantive changes in ASC methodology to determine whether they fit within rational application of the statutory guidelines for ASC methodology. Our review of the record persuades us that BPA acted rationally in making these exclusions.

In excluding state and federal income taxes, BPA recognized that the purpose of the ASC exchange program was to achieve parity between IOUs and publicly owned utilities insofar as their resource costs of energy were concerned. *See, e.g.,* H.Rep. No. 976 (Part II), 96th Cong., 2d Sess. 34–35 (1980).

In excluding income taxes from ASC computations, BPA looked to the fact that the IOUs pay income tax because they are organized to make a profit, a characteristic which publicly owned utilities do not share. In reviewing the decision, FERC concluded that it is not necessarily irrational for BPA to decide that BPA's other customers should not have to absorb the costs which the IOUs incur by virtue of their being profit making entities. The theory behind such exclusion of income taxes finds support in *Humana, Inc. v. Heckler,* 758 F.2d 696, 700–02 (D.C.Cir.1985), in which the D.C. Circuit upheld an administrative determination that income taxes of hospitals operating for profit should not be treated as a "cost" of medical services for medicare subsidization.

Petitioners argue that income taxes are commonly included as costs for purpose of rate making by state utility regulatory agencies. But there is no basis for assuming that Congress intended average system costs to be tied automatically to retail rates, which are set by state regulatory commissions, and are designed to compensate for all of a utility's costs and risks of doing business. *See, e.g., Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 602–03, 64 S.Ct. 281, 287–88, 88 L.Ed. 333 (1944); W. Fox, *Federal Regulation of Energy,* § 30.05, at 759 (1983). Had Congress intended traditional utility rate methods to apply, it easily could have so indicated.

The second substantive change in ASC methodology, the disallowance of return on equity and the substitution for it of the embedded cost of long-term debt, is more troublesome. The exclusion of equity costs was a major departure from BPA's earlier practical judgment, in the exercise of the broad discretion that it interpreted the Act to provide, that such an action might unwisely encourage increase of long-term debt.

Petitioners correctly observe that there is no logical congruence which would support making interest payments on debt a proxy for equity return. There is, as well, an inconsistency in first disallowing equity return and then further disallowing the taxes on such profits.

BPA's justification for the change, however, is based not upon logic, but upon experience. BPA instituted this ratemaking proceeding only after the original methodology had been in effect for more than a year. By the time it completed its revised methodology, it had a considerable record of experience with the original methodology that reflected the dangers of improper manipulation of accounting classifications. Under certain "creative financing" devices, terminated plant costs (the costs of a utility's investment in a power plant whose construction is terminated prior to its completion) could be reflected in higher equity return allowances, which are recognized by state regulatory agencies in setting rates. Under the initial methodology, the higher retail rates allowed a utility to seek a higher subsidy from BPA, thereby indirectly reimbursing the utility for its terminated plant costs. Yet such costs cannot lawfully be carried over into ASC rates because the Act expressly provides that plant termination costs must be excluded from calculation of average system costs. Regional Act section 5(c)(7)(C), 16 U.S.C. § 839c(c)(7)(C), provides, "average system cost shall not include ... any costs of any generating facility which is terminated prior to initial commercial operation." Under the initial methodology, terminated plant costs could be improperly concealed in return on equity costs.

The record shows at least one instance in which terminated plant costs were improperly included in return on equity costs. In 1983, BPA discovered that Portland General Electric Company (PGE) had violated the Regional Act and Oregon law by concealing terminated plant costs in its ASC filing through a financing scheme approved by the Oregon Public Utility Commissioner. The Commissioner's retail rate determination had formed the basis of PGE's filing under the initial methodology. In *Coalition For Safe Power v. Oregon Public Utility Commission*, No. A 8210–06692 (Multnomah County Circuit Court, Apr. 19, 1985) (bench ruling of Circuit Court Judge Richard L. Unis), the court confirmed the existence of the financing scheme and found that it refunded terminated plant costs to shareholders in violation of Oregon law.

BPA thus justifies its substitution of the cost of long term embedded debt for equity return as a way of "capping" BPA's subsidization of profits, in order to enforce the Act's exclusion of terminated plant costs from the ASC subsidy. We cannot hold that its action in this regard is irrational, as it is based upon a justifiable concern about abuse of the program. We therefore conclude that neither the change in ASC with respect to taxes nor the change with respect to equity violated the Act.

In upholding BPA's ASC determinations in this case, however, we do not sanction any permanent implementation of these exclusions. We uphold the exclusions in this instance because we conclude that we must defer to BPA's view that the statute authorizes such adjustments in ASC in response to BPA's experience with the program and the need to avoid abuses. The record in this case reflects that this is such a situation. The statute itself, however, neither commands nor proscribes these adjustments in ASC methodology.

## V. BREACH OF RESIDENTIAL AGREEMENTS BY PREMATURE INITIATION OF PROCEEDINGS

█ The residential agreements between the government and the IOUs contained a

provision which expressly contemplated that ASC methodology would be revised. The last sentence of that provision, however, included a proviso that the consultation process would not be initiated "sooner than one year after the immediately previous ASC methodology has been adopted by Bonneville and approved by the FERC."[1] The provision was soon after incorporated formally into a BPA regulation. *See* 46 Fed.Reg. 50,517 at 50,523 (1981).

Petitioners maintain that BPA failed to comply with the one-year restriction because it initiated the consultation process, which resulted in this revised methodology, only a day or so after the original methodology received its final approval. They therefore contend that there was a violation both of the contracts and regulation and that this violation requires us to set aside the methodology.[2]

The respondents, on the other hand, maintain that there was no violation of the one-year limitation because the consultation process was instituted on October 7, 1983, more than two years after FERC granted interim approval of the methodology on October 1, 1981. That approval put the revised ASC into effect. Respondents point out that the limitation was intended to make sure that all parties had at least one year of experience with the methodology before considering changes. This purpose is fully served by starting the clock at the time that the methodology went into effect.

Because BPA is charged with administering the statute and because BPA drafted the language of the contract term at issue, we should construe this provision against the background of the statute. We find little support in the text of the statute itself for the petitioners' assertion that "approval" means final approval and excludes interim approval. The statute, which contains an express provision for interim approval, 16 U.S.C. § 839e(i)(6), suggests otherwise. *See United States v. City of Fulton,* — U.S. ——, 106 S.Ct. 1422, 89 L.Ed.2d 661 (1986), holding that the Secretary of Energy was not precluded from making power rates effective upon interim approval, even though both the statute at issue and contracts provided that rate schedules would become effective "upon confirmation and approval of the Secretary."

Petitioners suggest that the term "approval" in the contract must mean final approval because this court does not have jurisdiction to review rates until after final approval. The reason we do not have such jurisdiction is not that the statute defines "approval" as "final approval." It is that the statute grants us jurisdiction to review only *"final* actions." 16 U.S.C. § 839f(e)(5) (emphasis added). Indeed, we would not be addressing petitioners' contract arguments had not FERC finally approved BPA's revised ASC methodology. But the fact that we may not review this methodology until BPA action becomes final has no bearing on whether BPA must wait until a year

1. Section VI of the 1981 methodology, which was incorporated into the residential exchange agreements, provides:

> The Administrator, at his or her discretion, or upon written request from three-quarters of the utilities who are parties to contracts pursuant to section 5(c) of the Regional Act, or from three-quarters of his preference customers, or from three-quarters of Bonneville's direct-service industry customers, shall initiate a consultation process as provided for in Section 5(c) of the Regional Act. After completion of this process, the Administrator may propose a new ASC methodology, provided that any consultation process may not be initiated sooner than 1 year after the immediately previous

ASC methodology has been adopted by Bonneville and approved by the FERC.
46 Fed.Reg. 50,517 at 50,523 (1981).

2. Petitioners brought an action for declaratory relief in the district court in which they asserted this same argument. The district court held that it did not have jurisdiction because petitioners' breach of contract claim constituted an attack on the rate making process, an area within the exclusive jurisdiction of this court. *See Pacific Power & Light Co. v. Bonneville Power Administration,* 589 F.Supp. 539 (D.Or.1984). Plaintiffs in that case have appealed to this court. *Pacific Power & Light Co. v. Bonneville Power Administration,* 795 F.2d 810 (9th Cir. 1986), filed this day.

after final approval to begin the revision process under a contract provision which does not use the word "final."

We therefore hold that BPA did not institute consultation procedures prematurely. It is not necessary to decide whether the provision should be reviewed as a regulation and thus deferentially to BPA's interpretation, or as a contract provision, and thus de novo. Our conclusion would be the same under either standard.

## VI. BPA'S REVISIONS TO ITS PROCEDURES FOR REVIEWING FUTURE ASC FILINGS BY IOUS

The petitioners also challenge that portion of the revised methodology that modifies the procedures for reviewing future ASC filings by IOUs. Those modifications provide that BPA will determine independently the appropriateness and the reasonableness of costs submitted as part of ASC computation by each utility. The petitioners argue that these provisions unilaterally amend their existing contracts with BPA and permit BPA to make *ad hoc* reductions in average system cost. Petitioners' challenge to the revised review procedures is not ripe for decision, however, because it is based solely upon petitioners' speculation that BPA may abuse its authority in the future. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967); *California Energy Resources Conservation and Development Commission v. Johnson,* 783 F.2d 858, 864–66 (9th Cir.1986). There is as yet no case or controversy to decide.

The petition for review in No. 85–7103 is denied and the remaining petitions are dismissed.

WALLACE, Circuit Judge, concurring in part:

While I agree with much of the majority opinion, I write separately for two reasons. First, I find the majority unduly grudging in its deference to the BPA's exclusion from ASC of return on equity. Second, I believe that we should address whether the

Tucker Act, 28 U.S.C. §§ 1346, 1491, precludes our exercise of jurisdiction over petitioners' claim that the BPA has breached the residential agreements.

### I

The majority properly recognizes that our standard of review of the BPA's exclusion from ASC of return on equity is highly deferential. The majority nonetheless finds this exclusion "troublesome." In its view, the exclusion is "based not upon logic, but upon experience." Maj. op. at 823. The majority finds the exclusion justified only as a response to a demonstrated need to enforce the Regional Act's exclusion from ASC of terminated plant costs. It makes clear that it does not sanction the permanent implementation of this exclusion. Maj. op. at 823.

I see no reason to so limit our deference to the BPA's decision to exclude return on capital from ASC. Applying reasonable accounting classifications, the BPA logically determined that return on capital incorporates certain costs that are not resource costs within the meaning of the Regional Act. These nonresource costs include terminated plant costs as well as the more general costs of bearing the risk of business enterprise. I therefore disagree that the exclusion is supported only by evidence that terminated plant costs have been disguised as part of return on equity. Because the rationale for the exclusion is broader and reflects reasonable accounting classifications, I would give the exclusion full approval.

### II

The BPA argues that we lack jurisdiction over petitioners' claims that the BPA breached the residential agreements by initiating its rate making prematurely, *see* maj. op. at 823–825, and by revising its procedures for reviewing future ASC filings, *see* maj. op. at 825. Because the BPA raises a serious challenge to our jurisdiction, I believe that we should address its argument.

The Tucker Act, 28 U.S.C. §§ 1346, 1491, both confers jurisdiction and constitutes a limited waiver of sovereign immunity. *North Side Lumber Co. v. Block*, 753 F.2d 1482, 1484–85 (9th Cir.) (*North Side*), cert. denied, — U.S. ——, 106 S.Ct. 248, 88 L.Ed.2d 256 *and*, — U.S. ——, 106 S.Ct. 265, 88 L.Ed.2d 271 (1985). Under the Tucker Act, if a contractual claim does not exceed $10,000 in amount, the district courts have original jurisdiction, concurrent with the Court of Claims. 28 U.S.C. § 1346(a)(2). If the claim equals or exceeds $10,000, the Court of Claims alone has original jurisdiction. 28 U.S.C. §§ 1346(a)(2), 1491. In neither case does the Tucker Act confer original jurisdiction on our court.

In claiming that the BPA breached the residential agreements by initiating its rate making prematurely and by revising its procedures for reviewing future ASC filings, petitioners assert a right that is essentially contractual since it derives from the residential agreements. *See North Side*, 753 F.2d at 1485–86; *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968–70 (D.C.Cir. 1982) (*Megapulse*). Their claims therefore fall plainly within the scope of the Tucker Act.

The BPA argues that the Tucker Act provides the exclusive basis for the assertion of contract claims against the United States. If so, it follows that original jurisdiction over petitioners' contract claims rests not in our court, but in either the Court of Claims or the district courts.

While the state of the law is not entirely clear, I believe that under our circuit precedent the jurisdiction conferred by the Tucker Act over contract claims against the United States is not exclusive. In *Munoz v. Small Business Administration*, 644 F.2d 1361, 1364–65 (9th Cir.1981) (*Munoz*), we held that a statute extended district court jurisdiction over contract actions against the Small Business Administration for money damages in excess of $10,000. In so doing, we rejected the district court's holding that the Tucker Act provides exclusive jurisdiction over contract claims against the government. *Id.* at 1363, 1365 & n. 3. The rule that emerges from *Munoz* is that jurisdiction under the Tucker Act is not exclusive where other statutes independently confer jurisdiction and waive sovereign immunity. *Id.* at 1364–65 & n. 3; see *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 895 & n. 8 (D.C.Cir. 1985) (discussing *Munoz*) (*Spectrum Leasing*); *Van Drasek v. Lehman*, 762 F.2d 1065, 1070–71 & n. 10 (D.C.Cir.1985) (same) (*Van Drasek*).

Our holding in *North Side* is not to the contrary. In *North Side*, 753 F.2d at 1485, 1486, we twice cited as authority the District of Columbia Circuit's opinion in *Megapulse*, which appeared to hold that the Tucker Act provides exclusive jurisdiction over contract claims against the United States. 672 F.2d at 967. The court in *Megapulse* stated that "a plaintiff whose claims against the United States are essentially contractual should not be allowed to avoid the jurisdictional (and hence remedial) restrictions of the Tucker Act by casting its pleadings in terms that would enable a district court to exercise jurisdiction under a separate statute and enlarged waivers of sovereign immunity. . . ." *Id.* Our holding in *North Side*, however, does not adopt *Megapulse*'s ostensible reading of the Tucker Act as granting exclusive jurisdiction for contract claims. It is true that we refer in *North Side* to "the Tucker Act's exclusive jurisdiction." 753 F.2d at 1482 n. 5. But our holding that the contractual claim was subject to the Tucker Act can be reconciled with *Munoz*, because in *North Side* no other statutes independently conferred jurisdiction *and* waived sovereign immunity with respect to the claim. Indeed, a reading of *Megapulse* that the Tucker Act provides exclusive jurisdiction is not the view of the District of Columbia Circuit. *See Spectrum Leasing*, 764 F.2d at 895 & n. 8; *Van Drasek*, 762 F.2d at 1070–71 & n. 10.

Here, section 9(e)(5) of the Regional Act, 16 U.S.C. § 839f(e)(5), both confers jurisdiction and waives sovereign immunity with respect to suits challenging final actions of

the BPA. The Tucker Act therefore does not bar our consideration of petitioners' contract claims as part of our review of the BPA's final rate making.