**CENTRAL ELECTRIC COOPERATIVE, INC., Petitioner,**

v.

**BONNEVILLE POWER ADMINISTRATION, U.S. Department of Energy, Respondent,**

**and**

**Direct Service Industrial Customers, Intervenors.**

No. 85–7242.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 3, 1987.

Decided Dec. 23, 1987.

Ronald L. Marceau, Marceau, Karnopp, Petersen, Noteboom & Hubel, Bend, Or., for petitioner.

Thomas D. Miller, Asst. U.S. Atty., Civil Div., Portland, Or., for respondent.

Paul M. Murphy, Heller, Ehrman, White & McAuliffe, Portland, Or., for intervenors.

Before HUG, FARRIS and CANBY, Circuit Judges.

HUG, Circuit Judge:

This case is brought as a direct proceeding under the Pacific Northwest Electric Power Planning and Conservation Act, 16 U.S.C. § 839f(e)(5) (1982) ("Regional Act"). Central Electric Cooperative ("CEC"), a utility, claims that Bonneville Power Administration ("BPA") breached their Residential Purchase and Sale Agreement by refusing to acknowledge a rate increase which would have led to an enhancement of the subsidy BPA is obliged to give under the contract. At issue is whether BPA's action should be reviewed in the context of contract law or administrative law; the latter would entitle BPA's action to due deference. We find that principles of administrative law govern.

FACTS

BPA is the marketing agent for all electric power generated by federal generating plants in the Pacific Northwest. During the power shortages of the mid-1970's, investor-owned utility ("IOU") customers of BPA lost their access to federal power and built their own generating stations. A disparity developed between rates paid by residential IOU customers and the lower rates paid by residential customers of publicly-owned utilities, which received power from BPA at a lower cost. In 1980, Congress enacted the Regional Act, in which it attempted to rectify the effects of federal power shortages on IOU's by establishing the "residential exchange program." *See Pacificorp v. Fed. Energy Regulatory Comm'n*, 795 F.2d 816, 818 (9th Cir.1986). This program subsidizes the residential rates of IOU's and other utilities participating in the program.[1] Section 839c(c)(1) disguises this subsidy as a fictional exchange of power between BPA and the utility. The section authorizes BPA to purchase power from the utility at "the average system cost" ["ASC"] of that utility's resources. 16 U.S.C. § 839c(c)(1). In exchange, BPA sells to the utility an equivalent amount of power at the same rate it charges its preference customers. When this rate is lower than the utility's ASC, the exchange, in essence, amounts to a subsidy. In actuality, no power is exchanged; BPA simply pays the utility the difference between its preference rate and the utili-

---

1. Although the program was prompted by the circumstances faced by IOU's, the broad language of the statute allows other utilities such as CEC to apply for subsidies as well. *See* 16 U.S.C. § 839c(c)(1) (extending program to "Pacific Northwest electric utilit[ies]").

ty's ASC.[2] This, in turn, "enables the utility to sell power to its residential customers at the priority rate given to residential consumers receiving BPA federal power." *Pacificorp*, 795 F.2d at 818.

To implement this program, each utility's ASC must be determined. "Average system cost" is not defined anywhere in the Act. Instead, the Act directs BPA to develop a "methodology" for making this determination and provides for review of the methodology by the Federal Energy Regulatory Commission. 16 U.S.C. § 839c(c)(7). BPA devised a formula in which the ASC equals "Contract System Costs" divided by "Contract System Load." The "Contract System Costs" consist of certain eligible costs (namely power production and transmission costs) allowed by the rate-setting body to determine the revenue requirement for the utility during a fixed period. The "Contract System Load" represents the total retail sales for the same fixed period.[3] A utility arrives at its ASC by plugging these components into the formula. If this ASC is higher than BPA's preferential rate, a utility is entitled to an exchange benefit as provided by section 839c(c)(1).

The Regional Act directs BPA to offer a contract to the utility embodying the "exchange of power." 16 U.S.C. § 839c(g)(1)(C). The generic contract offered utilities is called a Residential Purchase and Sale Agreement ("RPSA"). This dispute arises out of an RPSA entered into between BPA and CEC.

The crucial part of the agreement is Exhibit C, which sets forth the ASC methodology developed by BPA pursuant to the Regional Act.[4] The methodology requires CEC to maintain records in support of its ASC. The relevant data is compiled on forms contained in Appendix 1 to Exhibit C and submitted to BPA as an "Appendix 1 filing." This filing presents what the utility asserts is its ASC. As provided in the methodology, BPA will "determine" the utility's ASC. However, in doing so, BPA does not exercise a great degree of latitude. Rather, since the ASC is the result of a fairly straightforward calculation, BPA's role is akin to that of an auditor, verifying the accuracy and legitimacy of the data contained in the Appendix 1 filing.[5]

The ASC as set forth in the Appendix 1 filing is a fixed number from which the subsidy is calculated. In actuality, however, a utility's ASC may be subject to fluctuation. As indicated earlier, when the ASC increases, the span between the ASC and BPA's preference rate widens; this, in turn, creates the potential for a higher subsidy. A utility might thus have the incentive to submit a new Appendix 1 filing reflecting any increases in ASC. The methodology, however, limits the occasions on which a utility may submit a new filing. Each filing must be based on an identifiable "exchange period." The exchange period begins when new retail rate schedules are in effect.[6] Thus, a change in rate schedules triggers a new exchange period, at which time the utility may submit a new Appendix 1 filing.[7]

2. Only those costs associated with residential consumption are entered into the calculation. Therefore, the difference between the ASC and BPA's preference rate is multiplied by the component of the utility's retail load associated with residential consumption to yield the precise subsidy.

3. This figure must be identical to that used by the rate-setting body in establishing retail rates.

4. Section 12 of the RPSA incorporates Exhibit C into the contract.

5. Section IV A of Exhibit C states: "Each Appendix 1 shall be reviewed by [BPA] to determine whether the Costs are not inconsistent with generally accepted accounting principles for elec-

tric utilities, whether Contract System Costs contains only allowed Costs and whether the Appendix 1 complies with the requirements of this Exhibit C...."

6. Exhibit C states, "The ASC so determined will be in *effect during the Exchange Period*...." Exhibit C, § III (emphasis added). "Exchange period" is defined as "the period of time during which a Utility's jurisdictional retail rate schedules are in effect, *commencing with the effective date of these schedules and ending with the effective date of new retail rate schedules*...." Exhibit C, § II E (emphasis added).

7. The rationale behind the requirement that there be a rate proceeding was explained by BPA in its decision on reconsideration:

The dispute in this case concerns CEC's third ASC filing. On March 4, 1984, the Board of Directors of CEC adopted a retroactive rate increase effective September 20, 1983 to March 1, 1984. On March 5, 1984, CEC submitted its third filing: an after-the-fact filing based on the period covered by the retroactive rate increase. The ASC for this third period was higher than that for the second filing period; it thus would have entitled CEC to a greater subsidy. BPA paid an exchange benefit for the third filing. Subsequent to that payment, however, BPA reviewed the third filing and rejected it by an administrator's decision dated February 1, 1985. BPA found that "for purposes of ASC, ... there has not been a real 'rate increase'. There is no 'Exchange Period' because the alleged retroactive rate change is not in effect.... Absent a rate change, there is no basis for an ASC filing. Central's filing is hereby rejected." CEC was permitted to restate its arguments during a rehearing, but BPA affirmed its earlier decision. After rejecting the third filing, BPA claimed that the ASC from the second filing period remained in effect during the third filing period; CEC acquired a new ASC only when its fourth filing was accepted March 1, 1984. Because the ASC for the second filing was lower than the ASC for the third filing, BPA determined that CEC was not entitled to the full amount of the subsidy it claimed for the third filing. It thus withheld $662,494. from CEC's exchange benefits.[8]

The underlying dispute in this case revolves around BPA's determination that CEC's retroactive rate increase was invalid. BPA gave two primary reasons supporting its decision.[9] First, it found that a retroactive rate increase is per se an inappropriate basis for an ASC filing.[10]

Second, BPA found that there had been no "real" rate increase because the residential customers had never been charged.[11] According to BPA, CEC refrained from instituting a rate increase in the fall of 1983 even though its anticipated costs were rising. Instead of covering the costs by raising rates, CEC absorbed the costs out of cash on hand. In March, 1984, CEC experienced cash flow problems resulting from their decision not to raise rates in September, 1983. BPA alleges

In the development of the ... ASC Methodology, one of the primary matters to be resolved was the overall approach for determining the basic cost and other data needed to calculate an ASC.... Reliance on decisions of the relevant ratesetting bodies for the development of these costs was accepted on the premise that "[i]n determining retail rates, the Commissions make informed decisions on matters such as test periods, rate base, construction work in progress, and rates of return. The use of those findings simplifies and limits the matters to be determined within the ASC methodology."

Inherent in the very mention of "informed decisions" is the notion that there has been public scrutiny and the vigorous analysis of costs that is typically found in a rate case. ... Without the benefit of a rate case proceeding, BPA would find itself in the position of having to conduct continuous, expensive, time-consuming and burdensome audits of the utilities' books to ferret out the basic information underlying the proposed ASC change.

In the case of a cooperative such as CEC, the rate setting body is the Board of Directors.

8. This amount presumably represented the difference in subsidy resulting from the discrepancy in ASC between the second and third filing.

9. In its second decision, BPA also alluded to a third reason justifying its action. It asserted that CEC failed to provide sufficient documentation related to the filing. However, BPA did not mention that deficiency in its first decision, nor does BPA mention it in this proceeding. We decline to consider it at this point, as it would not alter our ruling.

10. BPA had originally declined to decide whether the retroactive nature of a rate increase precluded a new Appendix 1 filing. It stated, "Having found that Central's ASC filing does not constitute a valid filing, BPA need not address at this time whether a retroactive rate increase is an appropriate basis for an ASC filing." However, in its subsequent decision affirming the first one, BPA concluded that a decision on the issue was warranted, noting, "BPA does not wish that utilities somehow be lulled into believing that the retroactive issue is open to question and that retroactive rate increases may be an appropriate basis for an ASC filing."

11. In its second decision, BPA noted, "Central did not provide evidence to substantiate that a rate change affecting its customers actually occurred. Central did not provide any information identifying how its customers were notified of a retroactive rate increase or how this change affected its customers' bills."

that CEC solved this problem in a way that abused the subsidy program. CEC adopted a retroactive rate increase applicable only to residential and irrigation customers, who are the beneficiaries of the subsidy program. As stated in BPA's report, "Central [then] set the amount of the retroactive rate increase at exactly the amount Central expected to receive from the residential exchange." Because the subsidy offset the rate increase, the customers were relieved from ever having to pay the increased rate. BPA surmised that "the retroactive rate increase was structured so that the proceeds from the ASC benefits would flow directly to Central." In rejecting the Appendix 1 filing, BPA stated,

> [I]t is clear that the primary reason Central claims to have enacted a rate increase was to solve a cash flow problem in a way that did not result in a real "rate increase" to its customers. The ASC methodology was not designed by Congress to make BPA the "deep pocket" to which participating utilities turn.

## ISSUE

Though CEC contests BPA's rejection of its third filing, it has not asked us to resolve the dispute. Rather, CEC asks us to determine whether it is entitled to bring a breach of contract claim against BPA on the basis that BPA violated the RPSA. CEC's position is that BPA breached the RPSA by rejecting the third filing; it contends that since the RPSA contains no language allowing BPA to reject a filing on the basis it did, BPA's action amounted to a breach.[12] While CEC urges us to declare that contract law governs this suit, BPA argues that principles of administrative law prevail. BPA views its action as a regulatory decision rather than a breach of contract.

The choice of law is important in this dispute for two reasons. First, the application of administrative law would compel a court to treat BPA's action with the same deference normally accorded to agencies, *Pacificorp*, 795 F.2d at 820,[13] whereas the parties would assume equal footing in the context of contract law. Second, the choice of law affects the degree of evidence available for a court's review. If the action is based on contract law, both parties may present evidence, but if it is grounded in administrative law, the evidence is limited to the record developed in the administrative proceedings before BPA. 16 U.S.C. § 839f(e)(2). CEC asserts that it could provide evidence not contained in the administrative record to buttress its position in a contract action.

## DISCUSSION

We must thus decide whether to treat BPA's action as one of a contracting party or as one of an agency interpreting a regulation.[14] In doing so, a useful point of departure is the language of the RPSA itself which formed the basis of BPA's decision. In essence, the case turns on interpreting the definition of "exchange period,"[15] because BPA determined that CEC's rate change fell outside the circumstances contemplated by the parties in this provision. The basic inquiry is whether this definition is part of a regulation, in which case BPA's action should be evaluated in the context of administrative law, or if it is a bare contractual term, in which case the dispute should be analyzed against the backdrop of contract law. As the court in *Honeywell, Inc. v. United States*, 661

---

12. If we were to decide that these circumstances do give rise to a breach of contract claim, CEC would have us refer the matter to a district court for a resolution of the case. Because we decide that contract law does not apply, we need not discuss the appropriate course of action for hearing and deciding a contract dispute from this direct proceeding.

13. This court will not substitute its judgment for that of the administrative agency in technical fields within the agency's unique expertise. *Department of Water & Power v. Bonneville Power*

*Administration*, 759 F.2d 684, 695 (9th Cir.1985) (reviewing action by BPA). *See also Natural Resources Defense Counsel v. Hodel*, 819 F.2d 927, 929 (9th Cir.1987) ("[A]n agency's interpretation of the statutes it administers, or of its own regulations, is entitled to deference....").

14. We note that this circuit has considered the issue on just one occasion but left the question open. *See Pacificorp*, 795 F.2d at 825.

15. *See supra* note 6.

F.2d 182, 228 Ct.Cl. 591 (1981) made clear, contracts executed between private parties and the Government may incorporate regulations as contractual terms. In such an event, a reviewing court interprets the regulation to "effectuate the intent of the promulgators of the regulation," rather than construing it "to give it the effect intended by both parties.... The fact that a regulation may be incorporated into a contract does not require a different rule for regulation interpretation." *Honeywell*, 661 F.2d at 186.

We find that the definition of "exchange period" is actually part of a regulation. We begin by pointing out that the definition is found within the RPSA methodology, which itself is a regulation developed pursuant to statutory mandate. The methodology specifies that the authority to determine a utility's ASC rests with BPA. (Exhibit C, § III.) *See* 16 U.S.C. § 839c(c)(7). As a precondition to a change in ASC (and consequently, the amount of the subsidy), the methodology requires that there be an effective rate revision. This requirement is found in the definition of "exchange period." Thus, the determination of whether there has been a valid rate change and, in turn, a new exchange period, is the first step in making the final regulatory decision that CEC is entitled to a subsidy. The entire process of determining a utility's new ASC is a regulatory function which encompasses preliminary decisions such as the one at issue here.

The methodology itself indicates that the decision to reject a rate increase as the basis for a new filing is a regulatory one. Section IV delineates the review process BPA must adhere to when considering Appendix 1 filings. This process is typical of the kind normally accompanying agency actions.[16] Defining the scope of review, subsection (A) specifically states that BPA must determine "whether the Appendix 1 complies with the requirements of this Exhibit C *including applicable definitions....*" Exh. C, § IV A (emphasis added). "Definitions" includes the definition of "Exchange Period," which contains the requirement that there be a valid rate increase. Thus, BPA is instructed to ensure that a new exchange period is triggered by a bona fide rate increase, and its determination is subject to the procedural safeguards normally attending agency action. BPA, in fact, treated its decision in this case as a regulatory one by complying with the review procedures outlined in the methodology. The framework of the methodology leaves little room for holding that the definition of "exchange period" is a bare contractual term completely insulated from the regulation within which it lies.

Finally, the Regional Act, which created the subsidy program, indicates that BPA's action should be reviewed in light of administrative law. Section 839f(e)(1) states that, for the purposes of the Administrative Procedure Act ("APA"), certain final actions will be subject to judicial review. Listed among these are: "(B) sales, exchanges, and purchases of electric power under section 839c of this title [the residential exchange program]." The scope of review of those actions is governed by section 706 of the APA and is limited to the administrative record. 16 U.S.C. § 839f(e)(2). BPA's decision to reject a new Appendix 1 filing falls squarely within section 839f(e)(1)(B) because each new filing constitutes CEC's attempt to effectuate a new "sale," or "exchange" of power with BPA at a different rate. CEC argues that the rejection of its third filing falls outside the description of "sales, exchanges, and purchases of electric power" and is, instead, an "other final action" or decision not confined to APA review under this chapter. *See* 16 U.S.C. § 839f(e)(3), and (5). However, there is nothing to indicate that the decision in question falls into the catchall category of "other final actions"; rather, section 839f(e)(1)(B) accurately describes the nature of BPA's decision, as it undisputably pertains to a RPSA contract.

CONCLUSION

We hold that CEC's action before this court on a contractual basis is improper,

---

16. For example, BPA is directed to allow 180 days for review, to make a written report of its determinations, and to allow customers and other interested persons an opportunity to comment on the Appendix 1 filing. Exhibit C, §§ IV, B, C, and D.

and whatever relief CEC may be entitled to must be obtained through a review under the Administrative Procedure Act. While there may be some instances where contract principles should govern an agency's action, this is not one. We are unable to address the merits of this case because CEC has not fashioned its claim before us under the APA. Therefore, the petition is DISMISSED.