928 F.2d 905
 19 Fed.R.Serv.3d 675
 CP NATIONAL CORPORATION, a California corporation, Petitioner,
v.
BONNEVILLE POWER ADMINISTRATION, Respondent.
CP NATIONAL CORPORATION, a California corporation, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
 Nos. 89-70262, 90-70029.
 United States Court of Appeals,
Ninth Circuit.
 Augued and Submitted Nov. 9, 1990.
Decided March 26, 1991.
As Amended May 13, 1991.
 
 George L. Wagner, Spears, Lubersky, Bledsoe, Anderson, Young & Hilliard, Portland, Or., for petitioner.
 Jerome M. Feit, Solicitor, F.E.R.C., Washington, D.C., for respondent.
 Randy A. Roach, Asst. Gen. Counsel, Bonneville Power Admin., Portland, Or., for respondent.
 Appeal from Federal Energy Regulatory Commission and Bonneville Power Administration.
 Before WRIGHT, POOLE and THOMPSON, Circuit Judges.
 DAVID R. THOMPSON, Circuit Judge:
 
 
 1
 CP National applied to the Bonneville Power Administration ("BPA") for an increase in its average system cost ("ASC"). BPA determined that, pursuant to the 1984 average system cost methodology ("ASC methodology"), CP National was not entitled to an increase because the Oregon Public Utilities Commission ("OPUC") had not determined the costs in question to be reasonable for ratemaking purposes. The Federal Energy Regulatory Commission ("FERC") affirmed the BPA determination. CP National appeals this rate determination.
 
 
 2
 CP National presents three arguments urging reversal. First, CP National contends that BPA wrongfully refused to accept costs related to CP National's cogenerated power purchases as a basis for an increase in its ASC. Second, CP National argues that because it allegedly passed on to its ratepayers all subsidy monies advanced by BPA pursuant to its initial Appendix I filing, BPA could not subsequently recollect those monies from CP National. Third, CP National argues that it is entitled to the rate increase because BPA currently grants to CP National's transferee, Oregon Trail Electric Consumers Cooperative, Inc., the benefit of the higher rate, and thus the higher BPA subsidy. We affirm.
 
 FACTS
 
 3
 A. Statutory Background: The Residential Exchange Subsidy Program and the 1984 ASC Methodology
 
 
 4
 Section 5(c) of the Pacific Northwest Electric Power Planning and Conservation Act (the "Regional Act"), 16 U.S.C. Sec. 839c(c) (1988), established a power exchange program between BPA and investor-owned utilities ("IOUs") in the Pacific Northwest. Congress aimed with this exchange program to eliminate the disparity that developed between the rates paid by residential customers of the IOUs and the lower rates paid by residential customers of publicly-owned utilities, who receive lower-cost federal power. See California Energy Resources Conservation and Dev. Comm'n v. Johnson, 807 F.2d 1456, 1459-60 (9th Cir.1986); Pacificorp v. FERC, 795 F.2d 816, 818 (9th Cir.1986). The exchange program enables IOUs to furnish residential power at lower rates than their costs would otherwise permit, by providing IOUs access to federally funded power.
 
 
 5
 In reality, the exchange program established by the Regional Act amounts to "a mechanism for calculating a subsidy, not for establishing a traditional cost of purchased power." Federal Energy Regulatory Commission Order No. 400-A, "Methodology for Sales of Electric Power to the Bonneville Power Administration," 30 F.E.R.C. p 61,108, 61,195-96 (1985). The exchange actually transfers no power to or from BPA because the "exchange" is simply an accounting transaction: "In practice, only dollars are exchanged, not electric power." Public Util. Comm'r of Oregon v. Bonneville Power Admin., 583 F.Supp. 752, 754 (D.Or.1984).
 
 
 6
 Under the exchange system contemplated by section 5, each electric utility in the northwest may elect to sell power to BPA at the "average system cost of [a] utility's resources." 16 U.S.C. Sec. 839c(c)(1) (1988). BPA then sells the same amount of power back to the utility at BPA's lower wholesale rate.[1] This effectively enables the IOU to provide power to its residential customers at the same priority rate given to residential customers who receive BPA federal power.
 
 
 7
 The Regional Act sets the price of the exchange according to the IOU's "average system cost" ("ASC"), but does not specify the methodology to be used by the BPA in making ASC determinations. See Central Electric Coop. v. Bonneville Power Admin., 835 F.2d 199, 201 (9th Cir.1987). Instead, section 5(c)(7) of the Act provides only the manner in which the BPA should develop such a methodology:
 
 
 8
 The "average system cost" for electric power sold to the Administrator under this subsection shall be determined by the Administrator on the basis of a methodology developed for this purpose in consultation with the Council, the Administrator's customers, and appropriate State regulatory bodies in the region. Such methodology shall be subject to review and approval by the Federal Energy Regulatory Commission....
 
 
 9
 16 U.S.C. Sec. 839c(c)(7) (1988). We have characterized the methodology as "[t]he crucial part of the agreement" between BPA and the IOUs participating in the residential exchange subsidy program. Central Electric, 835 F.2d at 201. The ASC methodology currently in effect was adopted by the BPA in 1984, and subsequently approved by FERC and this court. See Administrator's Record of Decision (June 1984); FERC Order No. 400, "Methodology for Sales of Electric Power to Bonneville Power Administration," 49 Fed.Reg. 39,293 (1984); Order No. 400-A, 30 F.E.R.C. p 61,108 (1985); Pacificorp, 795 F.2d at 819, 821-25.
 
 
 10
 The 1984 ASC methodology takes a jurisdictional approach to cost determination. It relies heavily on the findings of state regulatory authorities that the rates submitted to BPA have been found reasonable for retail rate purposes. The BPA, in its record of decision adopting the 1984 methodology, explained this reliance:
 
 
 11
 Reliance on decisions of the relevant ratesetting bodies for the development of these costs was accepted on the premise that "[i]n determining retail rates, the Commissions make informed decisions on matters such as test periods, rate base, construction work in progress, and rates of return. The use of those findings simplifies and limits the matters to be determined within the ASC methodology." Inherent in the very mention of "informed decisions" is the notion that there has been public scrutiny and the vigorous analysis of costs that is typically found in a rate case.
 
 
 12
 Administrator's Record of Decision (June 1984), quoted in Central Electric, 835 F.2d at 201-02 n. 7. The ASC methodology makes clear to all involved in the power exchange program that costs must be approved by a state commission before they will be considered in an ASC determination.
 
 
 13
 Pursuant to the 1984 ASC methodology, a utility desiring a revised ASC determination must submit to BPA an Appendix 1 filing. The utility must include in the filing "a loss study, reflecting [the utility's] Costs as approved by the State Commission and a reconciliation of all Costs included on the revised Appendix 1 to the rate order issued by that utility's State Commission." Administrator's Record of Decision (June 1984) (filing instructions Sec. IIB3). Moreover, a utility may not file a revised Appendix 1 at just any time. Filings must instead be based on an identifiable "exchange period." An identifiable exchange period begins when a new retail rate goes into effect and ends when that retail rate is superseded by a further rate change. Central Electric, 835 F.2d at 201 & n. 6. Again, this exchange period requirement makes action by the retail regulatory body a prerequisite to any recomputation of a utility's ASC: the IOU cannot even get in BPA's door until the state regulator approves a proposed rate change.
 
 
 14
 B. History of CP National's Claim to an Increased Average System Cost Rate
 
 
 15
 This appeal concerns BPA's denial of CP National's average system cost increase request, and BPA's consequent denial of additional exchange credits under the Regional Act. As the discussion of the 1984 ASC methodology reveals, however, the real story begins earlier, with CP National's request to the state regulatory body for permission to raise its rates.
 
 
 16
 In late 1986 CP National filed for jurisdictional rate increases with the Oregon Public Utilities Commission ("OPUC"). Prior to a full hearing, OPUC issued Order No. 86-1211 authorizing an interim rate increase subject to refund pending OPUC's final determination.
 
 
 17
 The primary aim of CP National's request was the recovery of certain costs of cogenerated power purchased from qualifying facilities ("QFs") under the Public Utility Regulatory Policies Act of 1978 ("PURPA"), Pub.L. No. 95-617, 92 Stat. 3117 (1978) (codified at 16 U.S.C. Sec. 2601 et seq. (1988)). PURPA, as administered by both federal and state regulatory bodies, requires utilities to make compulsory power purchases from cogenerators and small power producers at their "avoided cost," as defined in the regulations:
 
 
 18
 "Avoided cost" means the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source.
 
 
 19
 18 CFR Sec. 292.101(b)(6) (1990). The applicable avoided cost is determined by the state regulatory body, here OPUC. OPUC, allegedly over the objections of CP National, required CP National to purchase PURPA power from certain cogenerators at the "avoided cost" of CP National's wholesale power supplier, the Idaho Power Company, rather than its own avoided cost. As a result, CP National purchased cogenerated power at prices Idaho was paying cogenerators under PURPA, rather than the lower prices CP National would avoid paying the Idaho Power Company if CP National purchased power from cogenerators. CP National's request for a retail rate increase stems from these PURPA power purchases.
 
 
 20
 CP National subsequently filed an ASC increase request with BPA predicated upon the interim rate increase. On the basis of CP National's Appendix 1 filing and OPUC Order No. 86-1211, BPA began making CP National's subsidy payments at the higher "as filed" ASC rate.[2] BPA ultimately paid CP National Regional Act Exchange Credits of approximately $1.1 million, which CP National, as required by law, passed on to its residential customers.
 
 
 21
 Following formal evidentiary hearings, OPUC rejected a stipulation entered into between its staff and CP National and terminated the interim rate increase. See OPUC Order No. 87-759. OPUC opined in that order:
 
 
 22
 [B]ased on the record presented, we are unable to find that the QF-related purchased power costs included in the stipulation have been reasonably and prudently incurred.
 
 
 23
 As far as we can ascertain, no hearings or formal proceedings were ever held to determine the reasonableness of the avoided cost rates contained in the QF contracts. Although executives of [CP National] now assert they knew the "avoided cost" pricing for these contracts was excessive and that at that time they opposed the decision of the Commissioner, there is no record of any request for a public hearing. In fact, despite the substantial rate impact upon [CP National's] customers over the terms of these agreements, no opportunity was given for the public to examine formally [CP National's] assertions that its rates are reasonable. From our perspective, the record in this case is also deficient because it fails to address issues that are critical to any determination of the reasonableness and propriety of [CP National's] QF-related purchased power costs.
 
 
 24
 OPUC concluded that it could not "continue to authorize interim relief pending a final decision."
 
 
 25
 After the record in No. 87-759 closed, CP National presented affidavits to show that a former Commissioner of OPUC had approved the "excessive" avoided cost.[3] OPUC offered to reopen the record and consider the proffered evidence if CP National would agree to a voluntary extension of the rate suspension period.[4] OPUC also offered to permit the disputed costs to accrue in an escrow account for later recovery to the extent that the costs were found to be reasonable. CP National rejected these offers.
 
 
 26
 Accordingly, OPUC issued Order No. 87-860. OPUC concluded:
 
 
 27
 The evidence in this record shows, and [CP National] has asserted in its petition for reconsideration, that the contract prices paid to the QFs were too high, i.e., that they were above [CP National's] actual avoided costs. As such, the contract prices are in violation of [Oregon law] which provides that the utilities shall not pay more than their avoided costs for purchases from QFs, unless expressly authorized by the Commission.
 
 
 28
 This Order No. 87-860 officially rejected CP National's rate increase request, and required CP National to refund all monies collected pursuant to Order No. 86-1211 (the interim rate increase).
 
 
 29
 CP National informed BPA by letter of the disposition of its Oregon state rate cases. BPA, in a report issued in September of 1987, concluded that OPUC orders No. 87-759 and 87-860 eliminated the costs and exchange period predicates necessary for any change in CP National's ASC. BPA noted that "[b]ecause there has been no [CP National] rate increase based upon its OPUC filings, [CP National] cannot submit a revised ASC filing for this period." Accordingly, BPA restored CP National's ASC to its prior amount, and began recollecting from CP National the exchange benefits previously paid.
 
 
 30
 Following BPA's decision, OPUC granted CP National's petition to reconsider its earlier orders. OPUC noted that CP National was finally willing "to offer evidence in support of its claim that its QF-related purchased power costs are reasonable and should be included in rates." Pending "a final decision in these cases" involving a determination whether the costs were "reasonably incurred," OPUC stayed its earlier refund order. OPUC Order No. 87-1087. At about the same time, CP National asked BPA to suspend its earlier ASC determination along with the refund billing that accompanied it. BPA ultimately refused to do so, and proceeded to offset the refund obligation against unrelated ASC payments otherwise due CP National.
 
 
 31
 In July of 1988, after further OPUC hearings but before any final determination as to the reasonableness of CP National's increase request could be made, CP National entered into an agreement with Oregon Trail Electric Consumers Cooperative, Inc. to sell Oregon Trail its Oregon electric utility assets. In order to facilitate the sale, CP National and OPUC's staff stipulated that if OPUC approved the sale and transfer by a certain date, CP National would withdraw all its rate increase requests except to the extent it had collected sums authorized by the interim rate increase. OPUC, relying on "public interest" considerations, issued Order No. 88-1151 which summarily approved the sale and transfer.[5] OPUC also approved its staff's stipulation, and rescinded the earlier refund order. OPUC made no findings or conclusions regarding CP National's QF purchase power costs. Indeed, in a later order, OPUC noted that
 
 
 32
 Upon issuance of Order No. 88-1151, [CP National] withdrew its [earlier] rate increase requests.... Those cases involved, among other things, an inquiry into the reasonableness of [CP National's] purchased power costs. Since the rate cases are no longer before the Commission, it is unnecessary to resolve those issues.
 
 
 33
 OPUC Order No. 88-1362.
 
 
 34
 CP National, noting that OPUC had stayed its refund order, asked BPA to do the same. BPA rejected CP National's request. BPA concluded that "the fact that OPUC was willing to accommodate the sale to Oregon Trail Electric Consumers Cooperative does not rise to the level of justification required before costs are exchangeable." BPA therefore refused to discontinue its recollection efforts.
 
 
 35
 CP National appealed BPA's final determination to FERC. FERC upheld BPA's decision, and refused to issue CP National additional exchange credits. FERC, echoing BPA's reasoning, concluded that
 
 
 36
 The Oregon Commission's November 18, 1988 order, while describing the long term benefits of the [CP National] sale to the Oregon Cooperative, does not retract the earlier statements to the effect that [CP National's] rates were excessive. BPA therefore concluded that the Oregon Commission permitted the imposition of excessive rates during the [interim rate increase] period as a direct cost of obtaining for ratepayers the benefits of the facilities sale.
 
 
 37
 CP National Corp., 48 F.E.R.C. p 61,329 at 62,081-82 (1989). This appeal followed FERC's denial of rehearing. CP National Corp., 49 F.E.R.C. p 61,309 at 62,166 (1989).JURISDICTION
 
 
 38
 Under the jurisdictional provisions of the Regional Act we have jurisdiction to review only final actions in BPA proceedings. See 16 U.S.C. Sec. 839f(e)(4)(D) (1988). In this proceeding, the BPA rate determination did not become final until FERC denied the petitioner's petition for rehearing. Thus, the notice of appeal in No. 89-70262, which was filed after the BPA determination but before FERC denied rehearing, was premature and that appeal is dismissed for lack of jurisdiction. Appeal No. 90-70029, on the other hand, is timely under section 9(e)(5) of the Regional Act, 16 U.S.C. Sec. 839f(e)(5) (1988), and remains for our consideration. For the reasons hereafter stated, we join the BPA as a necessary party in Appeal No. 90-70029.
 
 BPA'S STATUS AS A "NECESSARY" PARTY
 
 39
 Although section 839f(e) prevents us from exercising jurisdiction over the BPA in Appeal No. 89-70262, we may nevertheless add the BPA as a necessary party in Appeal No. 90-70029 in order to adjudicate this dispute in a thorough and efficient manner. See Provident Tradesmens Bank and Trust Co. v. Patterson, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968). It is necessary for us to do this for two reasons.
 
 
 40
 First, with only FERC as the respondent in the one appeal over which we have jurisdiction, we could not reach the merits of CP National's argument that BPA wrongfully recollected the conditional subsidy payment from CP National's shareholders rather than directly from its ratepayers. Our power to review BPA's payment of conditional subsidy payments finds its source in section 839f(e)(1)(B). That section authorizes judicial review of "sales, exchanges, and purchases of electric power under section 839c of [Title 16]." Section 839c does not require action by FERC to validate BPA's conduct of sales, exchanges or purchases. Thus, CP National's quasi-equitable claim would not lie against FERC alone.
 
 
 41
 Second, section 839f of the Regional Act authorizing judicial review clearly contemplates that the review would be of BPA determinations. While the provisions of the Regional Act do not prevent plaintiffs from including FERC as a party, the clear focus of the review provisions is on BPA, and not FERC. Thus, for example, section 839f(e)(1)(G) provides for judicial review of "final rate determinations under section 839e." Section 839e defines rate determinations as "established" only "upon confirmation and approval by the Federal Energy Regulatory Commission." Thus, judicial review is of the BPA action--the rate determination--and not FERC's subsequent approval and confirmation of the BPA determination. At the very least, then, a utility contesting a BPA rate determination should, where possible, include BPA as a defendant.
 
 
 42
 Joinder of the BPA as a necessary party is authorized by Federal Rule of Civil Procedure 19 which provides in pertinent part:
 
 
 43
 (a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action and the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest.... If the person has not been so joined, the court shall order that the person be made a party.
 
 
 44
 Rule 19 is designed to protect the interests of absent parties, as well as those ordered before the court, from multiple litigation, inconsistent judicial determinations or the impairment of interests or rights. The absence of "necessary" parties may be raised by reviewing courts sua sponte. McCowen v. Jamieson, 724 F.2d 1421, 1424 (9th Cir.1984); McShan v. Sherrill, 283 F.2d 462, 464 (9th Cir.1960). The issue can be properly raised at any stage in the proceeding. Cf. Provident Tradesmens, 390 U.S. at 126, 88 S.Ct. at 746.
 
 
 45
 An entity's status as a "necessary" party is not judged by any prescribed formula, but instead "can only be determined in the context of particular litigation." Provident Tradesmens, 390 U.S. at 118, 88 S.Ct. at 742. See also Niles-Bement-Pond Co. v. Iron Moulders' Union Local No. 68, 254 U.S. 77, 80, 41 S.Ct. 39, 40, 65 L.Ed. 145 (1920). Necessary parties have been described generally, however, as those "[p]ersons having an interest in the controversy, and who ought to be made parties, in order that the court may act on that rule which requires it to decide on, and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in it." Shields v. Barrow, 58 U.S. (17 How.) 130, 139, 15 L.Ed. 158 (1855).
 
 
 46
 We think it plain that BPA is a necessary party. First, excluding BPA from this lawsuit would merely result in unnecessary and repetitive litigation. Because this lawsuit might not be res judicata as to CP National's wrongful recollection argument, CP National could conceivably sue BPA in a separate action. That action would be merely a clone of this proceeding, with one crucial distinction--the court hearing that action would have the power to proceed to judgment as to BPA. Rule 19 was designed to prevent just this sort of wasteful litigation. See Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1043 (9th Cir.1983) (identifying as one goal of Rule 19 "precluding multiple lawsuits on the same cause of action."), cert. denied, 464 U.S. 849, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983); Bakia v. County of Los Angeles, 687 F.2d 299, 301 (9th Cir.1982) (identifying as one goal of Rule 19 "avoiding multiple litigation"). The Advisory Committee noted that, "The interests that are being furthered [in Rule 19] are not only those of the parties, but also that of the public in avoiding repeated lawsuits on the same essential subject matter." Fed.R.Civ.P. 19 advisory committee's note. Joining BPA as a necessary party removes any threat of unnecessary litigation.
 
 
 47
 There is no prejudice to either CP National or the BPA by joining the BPA as a party to the action in Appeal No. 90-70029 at this time. The BPA has been involved in every step of this consolidated appeal. The briefs of CP National and BPA in Appeal No. 89-70262 may be treated as their briefs in Appeal No. 90-70029. All issues raised by them in Appeal No. 89-70262 were fully argued before this court at the time of oral argument. The only reason we do not have jurisdiction over the BPA in Appeal No. 90-70029 is that CP National failed to include the BPA in that action, and inadvertently filed a premature notice of appeal in Appeal No. 89-70262. We will not allow these fortuitous circumstances in the context of these proceedings to prevent us from fulfilling our duty "to decide on, and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in" this proceeding. Shields, 58 U.S. at 139. Accordingly, we hold that BPA is a necessary party to the action in Appeal No. 90-70029 and join it as a respondent.
 
 STANDARD OF REVIEW
 
 48
 In Aluminum Co. of America v. Central Lincoln Peoples' Utility Dist., 467 U.S. 380, 389, 104 S.Ct. 2472, 2479, 81 L.Ed.2d 301 (1984), the Supreme Court established a highly deferential scope of review for courts considering BPA interpretations of the Regional Act:
 
 
 49
 Under established administrative law principles, it is clear that the Administrator's interpretation of the Regional Act is to be given great weight. "We have often noted that the interpretation of an agency charged with the administration of a statute is entitled to substantial deference." Blum v. Bacon, 457 U.S. 132, 141 [102 S.Ct. 2355, 2361, 72 L.Ed.2d 728] (1982). "To uphold [the agency's interpretation] 'we need not find that [its] construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.' ... We need only conclude that it is a reasonable interpretation of the relevant provisions."
 
 
 50
 467 U.S. at 389, 104 S.Ct. at 2479 (citations omitted). We have adhered to this deferential standard of review in previous cases involving BPA interpretations of the Regional Act. Pacificorp, 795 F.2d at 820-21; Department of Water & Power v. Bonneville Power Administration, 759 F.2d 684, 690-91 (9th Cir.1985). We do so here.
 
 DISCUSSION
 
 51
 A. BPA's Refusal to Adjust CP National's ASC
 
 
 52
 CP National contends that BPA erred by refusing to include in the ASC determination costs related to CP National's PURPA power purchases. It argues that the disputed costs must be included in the subsidy calculation because CP National in fact incurred the costs, and the amounts in question represented "governmentally mandated operating costs." CP National also argues that the costs cannot be considered excessive from a market standpoint, "as they were the very costs which Idaho Power Company was paying under PURPA to cogenerators selling power to it."
 
 
 53
 The relevance of these two arguments is not entirely clear. As discussed earlier, the 1984 ASC methodology takes a "jurisdictional" approach to the ASC determination. That is, the methodology recognizes only those costs approved by the local ratemaking authority. Because OPUC never approved the disputed costs, the BPA considered the costs ineligible for the subsidy program. Such a conclusion follows from the 1984 methodology as a matter of course.
 
 
 54
 In response to this conclusion, CP National argues that OPUC actually did authorize the disputed costs. CP National quotes extensively from a memorandum prepared by OPUC's legal staff, which concluded that the power costs should be allowed for retail ratemaking purposes. As FERC correctly noted, however, the views of the legal staff cannot be assumed to be the same as the views of OPUC. One must examine statements made by OPUC itself for its conclusions. In its order approving the stipulation and utility sale to Oregon Trail Electric Consumers Cooperative, OPUC explicitly stated:
 
 
 55
 Upon issuance of Order No. 88-1151, [CP National] withdrew its rate increase requests.... Those cases involved, among other things, an inquiry into the reasonableness of [CP National's] purchased power costs. Since the rate cases are no longer before the Commission, it is unnecessary to resolve those issues.
 
 
 56
 Order No. 88-1362 (emphasis supplied). Any contention that OPUC meant by this that the disputed costs were "reasonably and prudently incurred" finds no support in the record. While OPUC ultimately did suspend its refund order for the disputed amounts, it clearly did not find the costs to be reasonably and prudently incurred.
 
 
 57
 CP National suggests that it simply could not allow OPUC to determine the reasonableness of its cogenerated power purchase costs in this case. CP National explains in its briefs that
 
 
 58
 it could not accept the notion that the OPUC could question its prudence in incurring costs which the OPUC had directed it to pay, and it could not capitulate to the OPUC's assertion that it had the power to order a refund of amounts [CP National] had collected under authority of [the interim rate increase order], contrary to the provisions of [Oregon law].
 
 
 59
 Petitioner's Brief at 23.
 
 
 60
 Whatever the merits of CP National's underlying dispute with OPUC, the existence of such a dispute has no impact on the BPA's ASC determination. In making that determination, BPA properly relied on the earlier decision of the Oregon retail ratesetting authority. In doing so it followed the dictates of the 1984 ASC methodology. Because OPUC never found that the power costs were reasonably and prudently incurred, the costs were not eligible for the subsidy exchange program.B. The Recollection from CP National of the Interim Subsidy Payments
 
 
 61
 CP National contends that, because it allegedly passed on to its ratepayers all subsidy monies advanced by BPA pursuant to its initial Appendix 1 filing, BPA should not be permitted to recollect those monies from CP National. CP National asserts that "[t]he problem in this case is that the Regional Act subsidy was paid to and retained by [CP National's] residential ratepayers, but [CP National's] shareholders ended up paying the subsidy because BPA recollected it from [CP National], rather than the residential customers who had received it."[6] Petitioner's Reply Brief at 1.
 
 
 62
 CP National's Residential Purchase and Sale Agreement with BPA provides for all transactions to be undertaken by BPA and CP National, not CP National's ratepayers. See CP National Corporation Residential Purchase and Sale Agreement, dated September 28, 1981. While the agreement provides that the benefits of the exchange program must be passed through to the utility's ratepayers, the exchange program itself involves only CP National and BPA. There is no contractual relationship between BPA and CP National's ratepayers, and CP National suggests no method by which BPA could recover the interim subsidy payments from CP National's ratepayers. In any event, however, it must be remembered that CP National obtained the interim payments based on ASC costs it was unable to substantiate before the OPUC. While CP National may not now be able to recover from its ratepayers the interim payments it passed on to them, BPA is not responsible for this. There is no basis under these circumstances for requiring BPA to assume any resulting loss.
 
 
 63
 C. BPA's Treatment of Oregon Trail Electric Consumers Cooperative, Inc.
 
 
 64
 CP National's final argument relies on BPA's treatment of Oregon Trail Electric Consumers Cooperative, Inc. CP National notes that Oregon Trail, the assignee under the asset purchase agreement for the cogenerated power purchase contracts, currently receives subsidy program credits for those purchases. CP National contends that BPA does not have the authority to grant such credits to Oregon Trail on the one hand, and deny them to CP National on the other.
 
 
 65
 The simple response to this argument is that OPUC found the cogenerated power costs reasonable in one case, and unreasonable in the other. Oregon Trail assumed the disputed costs as part of an asset purchase, rather than as an original party to the power purchase agreements. OPUC deemed this a material difference.[7] Again, it seems that if CP National has a dispute at all it lies with OPUC, not BPA or FERC.
 
 
 66
 All pending motions in these consolidated cases are DISMISSED. The BPA rate determination is AFFIRMED.
 
 
 
 [1]
 Section 5(c)(1) of the Regional Act provides:
 Whenever a Pacific Northwest electric utility offers to sell electric power to the Administrator at the average system cost of that utility's resources in each year, the Administrator shall acquire by purchase such power and shall offer, in exchange, to sell an equivalent amount of electric power to such utility for resale to that utility's residential users within the region.
 16 U.S.C. Sec. 839c(c)(1) (1988).
 
 
 [2]
 In its brief, BPA explains that
 As an accommodation to exchanging utilities, and as a matter of administrative convenience, BPA makes residential exchange payments to a utility during the 210-day review period based upon the utility's "as-filed" ASC rate. Once a final ASC rate is determined, subsequent payments are either debited or credited to reflect the difference between the amount paid during the review period at the as filed rate and the amount for the same period at the rate finally determined by BPA.
 Respondent's Brief at 19.
 
 
 [3]
 Prior to July 1987, and at the time OPUC approved the interim rate increase, the Oregon Commission consisted of a single commissioner. Thereafter, a three-member panel constituted the Commission
 
 
 [4]
 That is, OPUC would reopen the record if CP National agreed to continue charging its ratepayers at the old pre-request rate
 
 
 [5]
 FERC described the "public interest" considerations relied upon by OPUC:
 The Oregon Commission stated that these actions were in the public interest, noting that the sale could result in long-term rate savings and stability to consumers due to the Oregon Cooperative's access to BPA preference power, the Oregon Cooperative's lower-cost resources, the Oregon Cooperative's exemption from income tax, and the Oregon Cooperative's access to low-cost financing.
 CP National Corp., 48 F.E.R.C. p 61,329 at 62,080 (1989).
 
 
 [6]
 CP National does not contest BPA's authority to advance subsidy credits on a conditional basis pending final approval of the Appendix 1 filing. CP National objects only to the recollection of the advance payments from its shareholders, rather than its ratepayers
 
 
 [7]
 OPUC justified its determination by pointing to the substantial benefits it saw accruing to residential customers from the asset purchase agreement between Oregon Trail and CP National. Seen in this light, OPUC's approval of Oregon Trail's power purchase was based on OPUC's eagerness to facilitate the asset purchase. CP National chooses to ignore this distinction in its briefs